UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHARESTATES INVESTMENTS, LLC, *Plaintiff*, v. O.N.C.E. APPRAISALS, LLC, et al., *Defendants*. | Civil Action No. 1:18-cv-01275 (CJN) |

**MEMORANDUM OPINION**

Plaintiff Sharestates Investments, LLC financed the purchase of real estate. 2d Am. Compl. ¶ 9, ECF No. 60. The buyer later defaulted and Sharestates foreclosed. *Id.* ¶ 39. During that process Sharestates discovered both that the appraisal was inflated and that another lender had placed a lien on the property. *Id.* ¶¶ 30–39, 20. Sharestates now brings tort and contract claims against the appraisers, *id.* ¶¶ 40–80, as well as the other lender, Greenhall Capital Partners, LLC and its member, Otis N. Ofori, *id.* ¶¶ 81–100. Greenhall and Ofori move to dismiss the counts against them for failure to state a claim. *See generally* Greenhall Defs.' Mot. to Dismiss 2d Am. Compl. ("Mot."), ECF No. 62. Because Sharestates plausibly alleges that Greenhall and Ofori played a role in its injuries, the Court denies the Motion.

**I.      Background**

In 2015, Howsoon Cham, the owner of Cape Point Group, LLC, applied for a loan from Sharestates to finance the purchase of real property in Washington's Lincoln Park neighborhood.

1

2d Am. Compl. ¶ 10.[1]  Cham engaged O.N.C.E. Appraisals, which valued the property at $3.2 million—equal to the intended purchase price. *Id.* ¶¶ 30–33.  Sharestates agreed to finance 80% of the purchase ($2.56 million), with the understanding that Cape Point would contribute a 20% down payment ($640,000) and cover closing costs. *Id.* ¶¶ 11–12, 14–16.  Ofori, an attorney, represented Cape Point in its negotiations with Sharestates. *Id.* ¶¶ 18–19.

Among the documents Cham signed in the course of applying for the loan (assisted by Ofori) were (1) a "Schedule A" form containing Cape Point's "financial . . . and ownership information" but "omitt[ing] any references to any other loans or encumbrances regarding the Property as well as any Buyer owners except Howsoon Cham," *id.* ¶ 10; (2) a "Term Sheet" documenting the loan's terms and conditions, *id.* ¶ 11; (3) the promissory note memorializing Cape Point's debt to Sharestates, *id.* ¶ 12; (4) the mortgage documenting Sharestates' security interest, *id.* ¶ 13; (5) a D.C. "Real Property Recordation and Transfer Tax Form FP-7/C" containing specific fields asking the parties to list all deeds of trust involved in the transaction but on which Cham did not mention a second deed of trust, *id.* ¶ 20; and (6) a "Commitment for Title Insurance" identifying encumbrances on the property but omitting any mention of Greenhall's alleged loan, *id.* ¶¶ 21–23.

The mortgage contract itself contained several provisions potentially bearing on the existence of competing security interests, including (1) a warranty that "all information provided to [Sharestates] is true, accurate and complete, in all material respects" and "does not omit any material facts;" (2) a warranty that the property was "subject to no lien, charge or encumbrance except" as otherwise disclosed; and (3) a duty not to, "directly or indirectly, by transfer,

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

mortgage, conveyance or sale of stock, permit, do or suffer the assignment, transfer, sale, conveyance or *encumbrance* of the Premises or any part thereof or *any interest therein without the prior written consent of [Sharestates]*." *Id.* ¶ 13 (quoting Mortgage Contract §§ 1.01–02, .17) (emphasis altered).  The mortgage's terms were to "survive the closing of the loan." *Id.* (quoting Mortgage Contract § 1.30).

Sharestates provided the funding and Cape Point closed on August 21, 2015. *Id.* ¶ 9. Unbeknownst to Sharestares, however, Cape Point brought no cash to the table; instead, Greenhall had wired $875,000 into the escrow account the day before closing to cover the down payment and closing costs on Cape Point's behalf. *Id.* ¶ 20.  Ofori, who was simultaneously acting as Cape Point's attorney and a member of Greenhall, was responsible for disbursing those funds. *Id.*  On October 15, nearly two months after closing, Greenhall and Cape Point documented a $560,000 loan. *Id.*  They notarized that document in December, and then in January Greenhall recorded a Deed of Trust "for repayment of a certain purchase money indebtedness." *Id.* (emphasis removed).  Greenhall also recorded the related security agreement, assignment of leases and rents, and fixture filing. *Id.*

Cape Point later failed to make payments on the Sharestates loan. *Id.* ¶ 38.  Sharestates accelerated the balance of payments, Cape Point defaulted, and Sharestates foreclosed. *Id.* ¶ 39; *see also* Affidavit of Non-Residential Mortgage Foreclosure, ECF No. 62-1.[2]  In preparation for a foreclosure sale, Sharestates retained its own appraiser, who valued the property at only $1.22 million—just over a third of the original purchase price.  2d Am. Compl. ¶¶ 36–37.  Sharestates

---

[2] The Complaint contains no information about Sharestates' foreclosure or subsequent sale of the property, but the Greenhall Defendants assert that the Court may take judicial notice of public records documenting those events. *See* Mot. at 6 n.5 (citing *Herron v. Fannie Mae*, CA No. 10-943, 2012 WL 13042852, at *2 (D.D.C. Mar. 28, 2012)).  Sharestates does not respond to that argument, so the Court takes judicial notice of the records. *See* Fed. R. Evid. 201.

eventually sold the property for $1.4 million.  *See* D.C. Office of Tax and Revenue Property Detail, ECF No. 62-3.  The Complaint does not allege that Greenhall had any involvement with the false appraisal, attempted to assert priority over Sharestates' interest in the property, or ever recouped its investment.

Sharestates brought this suit against Greenhall, Ofori, and several Appraisal Defendants.[3]  The Complaint contains two counts against Greenhall and Ofori (sometimes referred to collectively as "Greenhall" or "the Greenhall Defendants").  In Count IV, Sharestates alleges that those Defendants aided and abetted Cape Point's negligent misrepresentations about the source of Cape Point's cash at closing, thereby misleading Sharestates into approving the loan.  2d Am. Compl. ¶¶ 81–94.  Count V alternatively alleges that those Defendants entered into a civil conspiracy with Cape Point to defraud Sharestates.  *Id.* ¶¶ 95–100.  Greenhall moves to dismiss for failure to state a claim, contending that the Second Amended Complaint does not plausibly allege a misrepresentation, a fraudulent scheme, or proximate causation.  *See generally* Mot.

## II.     Legal Standard

Ordinarily, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted).  Although the Court accepts all well pleaded facts in the Complaint as true, "[f]actual allegations must be enough to

---

[3] The Second Amended Complaint does not name Cape Point Group or Cham as a Defendant.  Sharestates has moved for a default judgment against the Appraisal Defendants, ECF No. 51.

raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 554–55 (internal quotations and citations omitted). The claim to relief must be "plausible on its face," enough to "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

Sharestates' claims against the Greenhall Defendants, however, involve allegations of misrepresentation and fraud, so the Court evaluates them under a more stringent standard. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ P. 9(b). "[T]he circumstances that must be pleaded with specificity are matters such as the time, place, and contents of the false representations, such representations being the element of fraud about which the rule is chiefly concerned.'" *U.S. ex rel Totten v. Bombadier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis and internal quotation omitted). Plaintiff must "provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)).

### III.     Analysis

In Count IV, Sharestates alleges that Greenhall and Ofori aided and abetted Cape Point's (or Cham's) negligent misrepresentation of its ability to fund a portion of the purchase price and the closing costs, thereby inducing Sharestates to provide a loan it otherwise would have declined to give. 2d Am. Compl. ¶¶ 81–94. Alternatively, Count V alleges that Sharestates and

5

Greenhall affirmatively entered into an agreement to accomplish the same conduct with the intent of defrauding Sharestates. *Id.* ¶¶ 95–100.[4]

To state a claim for negligent misrepresentation, Sharestates must plausibly allege "(1) that [Cape Point] 'made a false statement or omitted a fact that [it] had a duty to disclose,' (2) that the statement or omission 'involved a material issue,' and (3) that [Sharestates] 'reasonably relied upon the false statement or omission to [its] detriment.'" *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 186 (D.D.C. 2016) (quoting *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. 1999)).  A claim for fraud must plausibly allege those same elements as well as that Cape Point made the misrepresentations "with knowledge of [their] falsity" and "the intent to deceive." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013); *see also Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) ("a complaint alleging negligent misrepresentations need not allege that the defendant had knowledge of the falsity of the representation or the intent to deceive.").

Although the Complaint contains two separate counts against Greenhall, the Parties' briefs do not distinguish which argument applies to which count.  That is likely because the two theories of liability are similar, so the arguments apply in equal measure to both counts.  The Complaint throws dozens of accusations at the wall to see if any stick,[5] but the core allegations seem to be that Defendants "assisted the Buyer in duping the Lender into believing [either] that the Cash at Closing was the Buyer's funds [and] that the Buyer did not make a loan secured by

---

[4] The Court has diversity jurisdiction over Sharestates' D.C.-law claims under 28 U.S.C. § 1332. 2d Am. Compl. ¶ 7.

[5] Paragraph 82 contains the primary allegations and consists of a single sentence.  That sentence occupies more than a page of the Complaint, contains twenty dependent and independent clauses, has at least eight different subjects, and uses the phrase "*inter alia*" three times.

6

the Property to obtain the Cash at Closing [or] that Howsoon Cham was the sole owner of the Buyer[] and that the Buyer did not give equity financing to obtain the Cash at Closing[.]" *Id.* ¶ 82. In other words, had Sharestates known that Cape Point had either taken out a loan from or sold equity in itself to Greenhall to fund its down payment, then Sharestates would not have approved the loan in the first place and thus would not have incurred a loss because of the subsequent default and foreclosure. *Id.* More specifically, Sharestates seems to allege that (1) Cape Point affirmatively represented that there was no second deed of trust, 2d Am. Compl. ¶¶ 20–26, and omitted from its representations the existence of either the alleged Greenhall loan, *id.* ¶ 26, or Greenhall's alleged equity financing, *id.* ¶ 29; (2) that the source of funds for cash at closing was a material element of the loan agreement, *id.* ¶¶ 28–29; (3) that Cape Point knew of the extra funding and intentionally omitted the information to deceive Sharestates, *id.* ¶ 20, and (4) that Sharestates made the loan in reliance on those misrepresentations and later lost money on the deal, *id.* ¶ 84.

In response, the Greenhall Defendants make three primary arguments: first, that the Complaint does not adequately allege that Cape Point had a duty to disclose its funding source for the cash at closing, *see* Mot. at 7–9; second, that the Complaint does not plausibly allege enough of a role in the scheme for the Greenhall Defendants to be vicariously liable for Cape Point's actions, much less that Greenhall's lien on the property existed at the time of closing, *see id.* at 9–12; and third, that the Complaint does not adequately allege they proximately caused Sharestates' damages because the appraisers independently caused the same injuries, *see id.* at 12–14. The Court addresses each argument in turn.

### A. Duty to Disclose the Source of Funds

To state a claim, the Complaint may allege either "an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen." *Saucier*, 64 A.3d

at 438 (internal quotation omitted). "Nondisclosure of material information may constitute fraud, especially where there is a duty to disclose . . . , [but m]ere silence does not constitute fraud unless there is a duty to speak." *Id.* at 439 (internal quotations omitted). Defendants argue that Sharestates does not plausibly allege that Cape Point had an affirmative duty to disclose the source of its funding for the down payment and closing costs. *See* Mot. at 7–9.

To support their argument, Defendants point to language throughout the Complaint suggesting that, while Sharestates may have had a subjective expectation that Cape Point would use its own money, Sharestates never concretely communicated that expectation to Cape Point or incorporated it into the mortgage contract. *See id.* For example, the Complaint alleges that Sharestates "*expected* the Buyer to use its own funds to pay for the Cash at Closing and required the buyer to have some skin in the game by requiring personal guarantees of all Buyer owners." 2d Am. Compl. ¶ 16 (emphasis altered).

In response, Sharestates has pointed to no independent legal duty that *always* requires a buyer to disclose the source of its down-payment funds to a lender. *See, e.g.*, *Saucier*, 64 A.3d at 439–40 (holding that there is no independent duty to disclose information that may bear on a mortgage contract's terms). Moreover, Sharestates does not allege that Cape Point had any fiduciary duty to it, as "the relationship between a debtor and a creditor is ordinarily a contractual relationship . . . and is not fiduciary in nature." *Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 373 (D.D.C. 2008) (internal quotation omitted).

Sharestates must therefore point to some duty contained within the contract's terms that required Cape Point to disclose the information (and put its attorney, Ofori, on notice of the same duty). The easiest way to do that would have been to attach a copy of the contract itself (or correspondence asking Cape Point for that information) to the Second Amended Complaint and

point the Court to the relevant language. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (permitting the Court to consider "any documents either attached to or incorporated in the complaint" when evaluating a motion to dismiss without converting the motion into one for summary judgment). But Sharestates attached no documents.

The Complaint instead contains several conclusory allegations that such a duty existed. For example, Sharestates contends that "every contract contains within it an implied covenant of both parties to act in good faith," and that this covenant of good faith and fair dealing created an implicit duty to disclose the source of funds. *See* Pl.'s Mem. of P. & A. in Opp'n to Greenhall Defs.' Mot. to Dismiss 2d Am. Compl. ("Opp'n") at 9–10, ECF No. 63 (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1087 (D.C. 2008)) (citing *Kelleher v. Dream Catcher, L.L.C.*, No. 1:16-cv-02092, 2019 WL 3458459, at *7 (D.D.C. Jul. 31, 2019)). But Sharestates points to no authority for the proposition that the implied covenant of good faith and fair dealing imposes such a specific disclosure duty in the mortgage context; *Kelleher* dealt with a contractor's failure to perform on a home-renovation contract, *see* 2019 WL 3458459 at *1, while *Choharis* rejected a claim for "bad faith in the handling of insurance claims," 961 A.2d at 1083. Neither case applies here, and Sharestates cites no others.

Sharestates also contends that the duty arises out of the contract's language warranting "that all information provided to [Sharestates] is true, accurate and complete, in all material respects, and to the best of [Cape Point's] knowledge does not omit any material facts." *Id.* ¶ 13 (quoting Mortgage Contract § 1.01) (emphasis removed). The Court cannot, however, deduce from a generic obligation to disclose material facts that Cape Point was on notice that *this* particular fact was material absent some specific communication to that effect from Sharestates. Any duty that Cape Point had must arise out of express disclosure requirements in the contract.

9

Sharestates finally alleges that it "required the Buyer to have some skin in the game and . . . directly conveyed [its expectations] to the Buyer in [Sharestates'] Term Sheet," which Cham executed on Cape Point's behalf.  2d Am. Compl. ¶ 16 (emphasis removed).  Sharestates gives scant detail about what it conveyed, what information it requested, and what it received.  2d Am. Compl. ¶¶ 16, 84.

Ordinarily, these sorts of conclusory allegations might fail to meet Rule 9(b)'s strict pleading standard, under which the Complaint must "state *with particularity* the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b) (emphasis added).  But as noted above, even under Rule 9(b) the Court must draw reasonable inferences in Sharestates' favor.  *See Anderson*, 221 F.R.D. at 253.  Defendants are correct that "the Court is not required to 'accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'"  Mot. at 10 (quoting *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016)).  Contrary to Greenhall's assertions, however, the Complaint does not exist in a vacuum.  Sharestates' allegations plainly describe an exceedingly common form of (potentially criminal) mortgage fraud:  the silent second mortgage.  In these situations, it is common for a potential buyer to

> misle[a]d lenders by failing to disclose the presence of "silent second mortgages" on the propert[y].  [The buyer] . . . inform[s] a lender that [the] buyer [is] going to make a sizeable down payment on the property, but the funds [are] actually borrowed from a second lender.  To create a pool of funds . . . , [a buyer] inflate[s] sale prices by providing fraudulent appraisals to the lender[]. . . . [T]he buyer[] eventually default[s] on the fraudulently brokered loan[].

*United States v. Spencer*, 700 F.3d 317, 320 (8th Cir. 2012) (Colloton, J.); *see also United States v. Johnson*, 729 F.3d 710, 712–14 (7th Cir. 2013); *United States v. Cavallo*, 790 F.3d 1202, 1210 (11th Cir. 2015).  That description fits the allegations here; the only missing piece is a direct quote from the contract indicating the precise language obligating disclosure of the other loan.

10

Requests for buyers' financial information are ubiquitous in loan application processes. *See Spencer*, 700 F.3d at 320; *see also* Opp'n at 14–16; Mot. at 9 ("[I]t is common for lenders to require submission of account statements in advance of closing."). To conclude that this contract did not plausibly contain the same language that nearly every mortgage contract contains, despite the Complaint's (admittedly conclusory) allegations to the contrary, would be inconsistent with Rule 12(b)(6)'s requirement to draw reasonable inferences in Sharestates' favor. It may be the case that Sharestates actually failed to convey such a requirement or failed to conduct due diligence, as Greenhall argues. *See* Mot. at 9. Discovery will shed light on that possibility, and Greenhall will have the opportunity to make that argument based on a complete evidentiary record. But at this early stage, Sharestates has plausibly pleaded that Cape Point had a duty to disclose the source of funds for its down payment.

### B. Vicarious Liability

Greenhall next argues that, even if Cape Point had a duty to disclose the information, the Complaint does not adequately allege that Greenhall or Ofori aided or abetted Cape Point's alleged misrepresentations or conspired to defraud. *See* Mot. at 9–12. Greenhall's argument focuses on Sharestates' allegations of a "Hidden Deed of Trust." 2d Am. Compl. ¶ 20. Sharestates alleges that Greenhall quietly provided the money to Cape Point in exchange for a security interest prior to closing, and that Cape Point and Greenhall waited several months to execute and record documentation of that agreement to conceal the deal from Sharestates. *Id.* The Parties agree that, if that were the case, the deal would have violated the warranty that the property was "subject to no lien, charge or encumbrance" except those otherwise disclosed. *Id.* ¶ 13 (quoting Mortgage Contract § 1.02) (emphasis removed); *see also* Mot. at 9–10.

Greenhall paints a different picture: it admits that it gave Cape Point the money but avers that it had no intention in August 2015 to take a security interest in the property. *See* Mot. at 11.

11

Greenhall instead claims to have invested in Cape Point's planned restaurant. *See id.* Months later, the restaurant began to falter and Greenhall began to doubt whether it would see a positive return on its investment. *See id.* It therefore negotiated a security interest in the property to serve as collateral for the prior investment, knowing all the while that its interest was junior to Sharestates'. *See id.* That story explains why the "Hidden Deed of Trust" did not appear until months after Cape Point closed on the property. *See id.*

If the Complaint alleged only that Greenhall took out a lien on the property in exchange for funding the down payment and that a failure to disclose this transaction constituted fraud without more, then perhaps Greenhall's argument would be enough to dismiss the Complaint. After all, a complaint's allegations must be plausible, not just conceivable, *Twombly*, 550 U.S. at 555, and Greenhall's story is just as conceivable as Sharestates' in light of the allegation that Greenhall recorded its deed months later.

But the Complaint alternatively alleges that the money constituted "Hidden Equity Financing," by which Cape Point sold a stake in its restaurant to an investor to obtain the money to buy the property without disclosing that information to the primary lender. 2d Am. Compl. ¶ 29. Greenhall's Motion does not meaningfully engage with that allegation. *See* Mot. at 8 n.6 ("If Plaintiff is alleging that Greenhall . . . owned or controlled a stake in [Cape Point], the [Complaint] does not include (and indeed could not include) evidence of this ownership stake."). In fact, Greenhall's account of its investment seems to serve as an admission of such an arrangement, thus validating the Complaint's accusations. *See* Mot. at 11; Opp'n at 18. Because the Complaint alleges that Cape Point had a duty to disclose its source of funding (whether or not a lien existed at the time of closing), 2d Am. Compl. ¶ 29, the admission seems to corroborate Sharestates' allegations that outside funding existed and that Cape Point failed to disclose it.

Whether Greenhall can be vicariously liable for breaching that duty is another question. Of course, a third-party lender may not be liable to the original lender merely for providing additional financing, even if the debtor itself might be subject to liability. To state a claim for aiding and abetting, Sharestates must allege "(1) a wrongful act causing an injury by a party aided by the defendant[s]; (2) the defendant[s'] knowledge of [their] role as part of an overall illegal or tortious activity at the time that [they] provided assistance; and (3) the defendant[s'] knowing and substantial assistance in the principal violation." *Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 236 (D.D.C. 2016) (internal quotation omitted).

Greenhall argues that its innocent investment in a restaurant "was not in contravention of any obvious requirement imposed by Plaintiff . . . and not intended to defraud Plaintiff." Mot. at 11. But the Complaint does not allege an uninvolved third-party lender or investor that may or may not have been aware of the original loan or its terms; it alleges (and Greenhall concedes) that Ofori, one of two members of Greenhall Capital Partners, himself represented the buyer in the transaction and "review[ed] the documents on [Cape Point's] behalf." Compl. ¶ 18; Ofori's Email of Jul. 29, 2015 at 1, ECF No. 64-1; Opp'n at 11 n.16. Greenhall cannot avoid the implication of its "knowing and substantial assistance in the principal violation," *Econ Research Servs.*, 208 F. Supp. 3d at 236, as the Complaint alleges (with supporting documentation) that Ofori reviewed the loan documents and thus plausibly knew of Cape Point's obligations to disclose outside funding, Ofori's Email at 1.

Greenhall's only remaining argument is that the Complaint does not plausibly allege that Greenhall or Ofori were aware that they were "part of an overall illegal or tortious activity." *Econ Research Servs.*, 208 F. Supp. 3d at 236; *see also* Mot. at 10–11. Greenhall points to the open wiring of money into the escrow account and open recordation of its subsequent deed of

13

trust to counter any implication that it was attempting to hide the deal from Sharestates. *Id.* But the Complaint certainly contains allegations of Ofori's intent, 2d Am. Compl. ¶ 89, and while allegations of fraud must be pleaded with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

### C. Causation

Greenhall finally argues that, even if the Complaint adequately alleges that Cape Point omitted material facts in its loan application, that Sharestates relied on those omissions in agreeing to provide financing, and that Ofori and Greenhall could be vicariously liable for those misrepresentations, the Complaint still does not plausibly allege that any of those actions proximately caused Sharestates' alleged damages. *See* Mot. at 12–14.

"Proximate cause is that cause which, in natural and continued sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *District of Columbia v. Harris*, 770 A.2d 82, 92 (D.C. 2001) (internal quotation omitted). In other words, "[a] defendant's conduct is the proximate cause of a plaintiff's injury only if 'the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances.'" Mot. at 12 (quoting *Steele v. Isikoff*, 130 F. Supp. 2d 23, 34 (D.D.C. 2000) (quoting *Sanders v. Wright*, 642 A.2d 847, 849 (D.C. 1994))).

The basic premise of Sharestates' claim is that, had it been aware that Cape Point intended to borrow money to cover its down payment and closing costs, Sharestates would have considered those intentions when assessing Cape Point's creditworthiness and would not have approved the loan. 2d Am. Compl. ¶¶ 27–28. Alternatively, had Sharestates been aware of other investors in the restaurant project, it would have required them to provide personal guaranties to repay the loan in the event that Cape Point could not make its payments. *Id.* ¶¶ 16, 29.

14

Sharestates required the same of Howsoon Cham, who averred that he was Cape Point's sole owner.  *Id.*  In either case, Sharestates would not have made the loan without additional protection, thereby avoiding the eventual loss it took on the default and foreclosure.  *Id.* ¶ 84.

Greenhall, in turn, points to other language in the Complaint in which Sharestates specifically identifies a second proximate cause of its injuries:  the inflated appraisal.  *See* Mot. at 13 (quoting 2d Am. Compl. ¶ 55 ("The Lender's damages were proximately caused by the Appraisers' failure to use that degree of care and skill that a reasonably competent appraiser would have used in preparing an appraisal of the Property.")).  In Greenhall's view, if the appraiser had correctly valued the property at $1.2 million in the first instance, then Sharestates would only have loaned 80% of that figure, or $960,000, and if Cape Point had still defaulted, Sharestates would have foreclosed and sold the property as it did for $1.4 million—more than enough to pay off the hypothetical mortgage with, perhaps, some left over to mitigate Greenhall's losses on its own investment.  *Id.*  Therefore, Greenhall argues, the Complaint's own allegations negate any possibility that Greenhall proximately caused Sharestates' injuries.  *Id.*

Sharestates' exceedingly cursory response is that the Complaint plausibly alleges that Sharestates would not have made any loan at all if it had been aware of Greenhall's involvement; that it agreed to the loan in reliance on Cape Point's misrepresentations of Greenhall's participation; and that Sharestates was subsequently injured by Cape Point's default.[6]  Opp'n at 21–22.  In its words, "[w]hether or not the Appraisers are joint tortfeasors is a matter beyond the

---

[6] Sharestates argues in part that its allegations of proximate causation as to the Greenhall Defendants were adequate because the Second Amended Complaint "actually used the term proximate in . . . ¶ 98."  Opp'n at 22.  The Court reminds plaintiffs that the "obligation to provide the grounds of . . . entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 554–55 (internal quotations and citations omitted).

15

scope of a motion to dismiss; joint tortfeasors do not escape liability because others also proximately cause a plaintiff's injury." *Id.* at 22 (citing no authority).

Although Sharestates' argument here is exceedingly thin, it is correct. "It is well[ ] established in this jurisdiction that one cannot escape liability for one's own negligence merely because another person, with whom one has no connection, or over whom one has no control, may have contributed to the injury by his wrongful or negligent act." *Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982). "The law does not recognize a single proximate cause of every injury. There may be several causes concurring to produce the harm." *Id.* "Two persons whose concurrent negligence causes injury to a third are liable jointly and severally, and their liability will not be affected by the relative degree of negligence, or by the care required of each." *Id.*

In *Hill*, a child fell from an exterior stairwell at his apartment building after slipping on a puddle and then falling through the stairwell's protective railing. *Id.* at 136. He sued the landlord for negligently allowing the puddle to remain on the stairs, and the landlord then cross-claimed against the architect for negligently designing the stairwell and railing. *Id.* The plaintiff and landlord settled, and the trial court subsequently granted summary judgment to the architect because it found that the settlement, by releasing one defendant from liability, had the effect of releasing *all* defendants. *Id.* The Court of Appeals reversed for the long-established reason that each defendant may have proximately caused the injury, so a settlement as to one defendant has no effect as to others unless the single settlement has made the plaintiff whole. *Id.* at 138–39. Moreover, only a jury can decide questions of proximate causation, with rare exceptions. *Id.*

This case presents the same chicken-and-the-egg problem. The Court assumes for the sake of argument that the Complaint adequately pleads proximate causation as to the Appraisal Defendants. But so long as it also pleads causation as to the Greenhall Defendants, the Court

16

cannot dismiss the claims on causation grounds at this early stage.  *Id*.  The Complaint alleges that Greenhall and Ofori provided a cash infusion to cover the down payment on a multimillion-dollar property and assisted the Buyer in obtaining financing without disclosing their own financial interest in the property or Cape Point's true financial status and obligations.  2d Am. Compl. ¶¶ 20, 29.  The Complaint contains just enough information to make it foreseeable at closing that (1) Sharestates might approve the loan based on incomplete information, (2) that Cape Point would be unable to make its payments, and (3) that Sharestates would be forced to foreclose.  "The defendant need not have foreseen the precise injury, nor should [he] have had notice of the particular method in which a harm would occur, if the possibility of harm was clear to the ordinary prudent eye."  *Harris*, 770 A.2d at 92 (internal quotation omitted).  Even if Greenhall did not foresee the magnitude of the loss, it is still plausible that its actions may have proximately caused the injury, at least in part.

### IV.  Conclusion

Sharestates has adequately (if unartfully) alleged that Cape Point had a contractual duty to disclose Greenhall's funding when Cape Point applied for a loan and that it failed to do so.  It has also plausibly alleged that Otis Ofori, who was simultaneously representing Cape Point in the loan application and providing the extra cash as a member of Greenhall, knew what was going on and either aided Cape Point in misrepresenting its financial status or conspired with Cape Point to defraud Sharestates.  And although Sharestates has alleged that other tortfeasors also played a role in causing its injuries, it may allege several proximate causes at this early stage.  The Court therefore denies Greenhall's Motion to Dismiss.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  July 16, 2020

*[signature]*
CARL J. NICHOLS
United States District Judge